1
2
3
4
5

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROY T. LARSON, | ) | 1:08-cv-01136-LJO-JLT |
| | ) | |
| Plaintiff, | ) | FINDINGS AND RECOMMENDATION RE: |
| | ) | PLAINTIFF'S SOCIAL SECURITY |
| v. | ) | COMPLAINT (DOC. 1) |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff is seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying his application[1] for Supplemental Security Income (SSI) benefits.  The application for SSI benefits was based upon a disability commencing on September 1, 1997, due to a broken left femur and hypersensitive right leg with nerve damage. (A.R. 99-101, 105.) The matter was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 302(c)(15).[2]

Under review is the May 25, 2007 decision of Administrative Law Judge (ALJ) Stephen W. Webster. (A.R. 17-26). This decision was rendered after a hearing held on May 15, 2007, at

---

[1] Plaintiff's application is headed with a date of January 4, 2000, and was dated February 19, 2000 (A.R. 99-101);however, the ALJ stated that Plaintiff protectively filed an application on January 19, 2000 (A.R. 17).

[2] By order of Chief Judge Anthony W. Ishii filed on December 28, 2009, the action was assigned to the undersigned Magistrate Judge.

1    which Plaintiff appeared and testified with the telephonic assistance of counsel (A.R. 17).[3] The

2    Appeals Council denied Plaintiff's request for review on June 13, 2008  (A.R. 6-8), and thereafter

3    Plaintiff filed his complaint in this Court on August 1, 2008. Briefing commenced with the filing

4    of Plaintiff's opening brief on June 3, 2009. Defendant's opposition was filed on August 4, 2009,

5    and Plaintiff's reply was filed on August 19, 2009. The matter has been submitted without oral

6    argument to the Magistrate Judge.

7         I.      Jurisdiction

8         The docket reflects that Plaintiff timely filed his complaint on August 1, 2008. Therefore,

9    the Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§

10   1383(c)(3) and 405(g).

11        II.     Standard and Scope of Review

12        Plaintiff argues that the ALJ erred by 1) not finding Plaintiff's hepatitis C and alleged

13   personality disorders to be severe impairments; 2) rejecting the medical opinions of Plaintiff's

14   treating and examining physicians, 3) failing to develop the record, and 4) presenting an

15   incomplete hypothetical question to the vocational expert at the hearing.

16        Congress has provided a limited scope of judicial review of the Commissioner's decision

17   to deny benefits under the Act. In reviewing findings of fact with respect to such determinations,

18   the Court must determine whether the decision of the Commissioner is supported by substantial

19   evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla,"

20   Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v.

21   Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a

22   reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401.

23   The Court must consider the record as a whole, weighing both the evidence that supports and the

24

25        [3] A different ALJ had conducted a hearing and issued a prior decision on December 2, 2002. (A.R. 42-51.)
     On August 18, 2003, the Appeals Council remanded the matter for further evaluation of Plaintiff's past work activity
26   and for development of additional vocational evidence to clarify the effect of assessed limitations on the
     occupational base. (A.R. 83-86.) Further administrative proceedings followed, which culminated in the decision
27   under review.
          By the time of the hearing in May 2007, Plaintiff had found some modified work he could perform and
28   asked for a closed period of disability from his date of application until April 2004. (Op. Brf. p. 2, ll. 22-25.)

2

1  evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of

2  evidence that supports the decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.

3  2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

4  It is immaterial that the evidence would support a finding contrary to that reached by the

5  Commissioner; the determination of the Commissioner as to a factual matter will stand if

6  supported by substantial evidence because it is the Commissioner's job, and not the Court's, to

7  resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

8      In weighing the evidence and making findings, the Commissioner must apply the proper

9  legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review

10  the whole record and uphold the Commissioner's determination that the claimant is not disabled if

11  the Commissioner applied the proper legal standards, and if the Commissioner's findings are

12  supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812

13  F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the

14  ALJ did not use the proper legal standard, the matter will be remanded to permit application of the

15  appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

16      III.    Disability

17          A.    Legal Standards

18      In order to qualify for benefits, Plaintiff must establish that he is unable to engage in

19  substantial gainful activity due to a medically determinable physical or mental impairment which

20  has lasted or can be expected to last for a continuous period of not less than twelve months. 42

21  U.S.C. § 1382c(a)(3)(A). Plaintiff must demonstrate a physical or mental impairment of such

22  severity that he is not only unable to do the his previous work, but cannot, considering age,

23  education and work experience, engage in any other kind of substantial gainful work which exists

24  in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453,

25  1456 (9th Cir. 1989). Initially, Plaintiff bears the burden of establishing a disability, meaning that

26  he must prove that he is unable to return to his former type of work.  If he succeeds, the burden

27  shifts to the Commissioner to identify other jobs that he is capable of performing considering his

28

3

1  residual functional capacity, as well as his age, education and his last fifteen years of work

2  experience. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

3        The regulations provide that the ALJ must make specific sequential determinations in the

4  process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity

5  since the alleged date of the onset of the impairment, 2) whether solely on the basis of the medical

6  evidence the claimed impairment is severe; that is, it is of a magnitude sufficient to limit

7  significantly his physical or mental ability to do basic work activities; 3) whether solely on the

8  basis of medical evidence the impairment equals or exceeds in severity certain impairments

9  described in Appendix I of the regulations; 4) whether the applicant has sufficient residual

10 functional capacity, defined as what an individual can still do despite limitations, to perform the

11 applicant's past work; and 5) whether on the basis of the applicant's age, education, work

12 experience, and residual functional capacity, the applicant can perform any other gainful and

13 substantial work within the economy. See 20 C.F.R. § 416.920.

14            B.     The ALJ's Findings

15       The ALJ found that Plaintiff had severe impairments including a fractured left leg, chronic

16 bilateral leg pain, and depression. (A.R. 19.) However, the ALJ found that Plaintiff did not have

17 an impairment or combination of impairments that met or medically equaled a listed impairment.

18 (A.R. 20.)  Also, the ALJ determined that Plaintiff retained the residual functional capacity (RFC)

19 to lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk six

20 hours each in an eight-hour workday; and perform simple, repetitive tasks. (A.R. 20.) Although

21 Plaintiff was unable to perform any past relevant work, as a younger individual (forty-eight years

22 old at the time of the hearing) with a high school education and ability to communicate in English,

23 and in light of Plaintiff's work experience and RFC, the ALJ found that significant numbers of

24 jobs existed that Plaintiff could perform, including laundry worker and cashier. (A.R. 24-25.)

25 Thus, the ALJ concluded that Plaintiff had not been under a disability since January 19, 2000.

26 (A.R. 17, 25.)

27 ///

28

IV.   The Medical Record

Dr. William C. Bothamley began treating Plaintiff on January 11, 2000. (A.R. 180-82.) On that day, he prescribed Amitriptyline, which was discontinued when it made Plaintiff drowsy, and Vicodin. Id. Two weeks later on January 27, 2000, Dr. Bothamley completed a "Physical Evaluation" of Plaintiff in connection with complaints of worsening bilateral leg pain over the last nine years. (A.R. 161-64.) Dr. Bothamley noted that Plaintiff's left femur had been fractured nine years before, with a subsequent revision of the original surgery two years before. Plaintiff complained of increasing pain in both legs that Dr. Bothamley described as "neuropathic." Plaintiff complained that his legs were weak at times and would "give out." Plaintiff exhibited full range of motion of the lower extremities and could cross his legs and get on and off the examining table.

Dr. Bothamley reviewed Plaintiff's history as having a comminuted fracture of the left femur with neuropathic pain in both legs that created significant interference with his ability to perform one or more basic work-related activities. Dr. Bothamley opined that Plaintiff could perform sedentary work which required lifting of no more than ten pounds and but which include frequent lifting of some small articles. Plaintiff reported that after lifting items heavier than ten pounds for a day, he would have significant problems with agility and flexibility and would have reduced lifting ability.

Dr. Bothamley estimated that for about twenty weeks, Plaintiff would be unable to perform at least half-time in a normal day-to-day work setting, but the doctor expected that Plaintiff would improve with medication for his "suspected neuropathy." (A.R. 162.) The doctor had not reviewed prior medical records and thus could not comment further.

Neurologist Peter C. Gilmore, M.D., examined Plaintiff on March 20, 2000, and evaluated Plaintiff's complaints of paresthesias from the knee down in the right leg, weakness of the right leg, back pain, and chronic pain of the left leg due to multiple fractures of the femur and two related surgeries. (A.R. 173-75.) Plaintiff reported that he had suffered compression fractures to the lumbar spine fifteen years before. (A.R. 173.) Dr. Gilmore found that strength was normal in

each leg, with no focal atrophy and that Plaintiff had the ability to squat and walk on his heels and toes without weakness. Dr. Gilmore found a "subjective" slight difference in light touch below the knee in the right leg involving all surfaces. Dr. Gilmore noted that Plaintiff's history was a history of lumbarplexus neuropathy occurring to the right leg in 1990, with partial improvement but noted that there was really no truly objective evidence of it. (A.R. 174.) Because the symptoms were felt by Plaintiff to have progressed and to worsen with walking, Dr. Gilmore felt that lumbar stenosis was a possible explanation. Dr. Gilmore recommended that Plaintiff undergo a CT scan of the lumbar spine but that if it reflected no significant stenosis, then there was little treatment available. Dr. Gilmore felt that in this event, anti-convulsants such as Tegretol or Neurontin could improve the unpleasant dysesthesias, but they would not improve the function of the right leg. (A.R. 174-75.)

Plaintiff underwent a lumbar CT scan on March 22, 2000. It found no evidence of a vertebral segment fracture. Also, it noted a very mild bulge at L2-3 with no spinal canal narrowing; no bulge at L3-4, with patent spinal canal; a moderate bulge at L4-5 with mild ligamentum flavum hypertrophy, and with neural foraminal narrowing suspected; and a mild bulge at L5-S1 with no significant spinal stenosis. An MRI was recommended. (A.R. 176-79, 183.)

Non-examining state agency medical consultant Dr. N. E. Staley opined on May 17, 2000, that as a result of his fractured femur, Plaintiff could perform light work, or lift and carry twenty pounds occasionally, ten pounds frequently, and stand, walk, and sit about six hours in an eight-hour workday, without any other limitations. Dr. Staley relied on the CT scan and Plaintiff's abilito to perform all household activities, yard work, and mechanical work. Dr. Staley concluded that Plaintiff's subjective complaints were only partially credible, giving little weight to Dr. Bothamley's assessment, which was largely based on Plaintiff's history and which reflected that Plaintiff had full range of motion. (A.R. 185-192.)

On May 25, 2000, Plaintiff visited the emergency room at Klickitat Valley Hospital. At that time, Plaintiff complained of pain shooting down his right leg into his foot with a "fire like"

sensation.  Despite this, Plaintiff rode his bicycle to the emergency room to refill his Vicodin

prescription and complained that Dr. Bothamley expected thirty Vicodin to last thirty days. (A.R.

184.) Plaintiff was alert and non-distressed.  He had no tenderness over the spinous process,

sacrum, or gluteal muscles.  The doctor, Lance Petersen, M.D., observed Plaintiff to be up and

walking in the exam room and looking in the cupboards when the doctor arrived.  Dr. Peterson

noted that Plaintiff spontaneously bent from the waist to the ground to pick up a coffee cup. (Id.)

Dr. Petersen assessed Plaintiff's condition as neuropathic pain secondary to old injuries, and that

he had "Narcotic issues." Dr. Peterson instructed Plaintiff to see Dr. Bothamley for narcotic refills

but offered him Trazodone to improve sleep. (Id.)

From March through June 2000, the Family Practice Clinic in Goldendale, Washington

prescribed Plaintiff Vicodin, which was refilled in late March.  The clinic's records indicate that

Amitriptyline discontinued and Neurontin substituted.  Also, Hydrocodone was refilled with

fifteen tablets on April 10, but that Plaintiff made for more of the narcotic a week later, but this

request was denied. Instead, Plaintiff was told to increase his Neurontin dose and told that he

would not receive more Vicodin. On May 16, 2000, Plaintiff was prescribed thirty Vicodin.  A

month later, Plaintiff requested Hydrocodone from Dr. Garnott but the request was denied.  On

June 23, he received prescription for the drug and on June 26, Plaintiff was referred to the pain

clinic. (A.R. 193-96.)

On August 9, 2000, Dr. Carolyn O'Connor of the Family Practice Clinic noted that she

received the referral for pain management for Plaintiff but that communication with Plaintiff had

been unsuccessful.  (A.R. 204.)

A MRI study of Plaintiff's lumbar spine taken on August 14, 2000.  It showed mild

degenerative disease at T11-12 and L4-5. It showed normal alignment and structure of the

vertebral bodies with mild bulging of the L4-5 and L5-S1 discs with little impression on the thecal

sac noted.  Also, it revealed mild to moderate bilateral foraminal stenosis at L4-5 and L5-S1 and

degenerative disc disease with dehydration at L4-5 and L5-S1. (A.R. 198-99.)

On August 21, 2000, Plaintiff visited the emergency room for right lower leg pain, and he

was given medications that included five Vicodin tablets to take home. (A.R. 202.) The next day, Plaintiff checked into the urgent care center and was requesting pain medications at that time.  He was treated by Dr. Lance Peterson.  Dr. Peterson contacted Dr. O'Connor's office and was told that he had failed to make contact with that office despite repeated contact attempts.  Instead, he appeared at Dr. O'Connor's office earlier in the day and angrily demanded pain medication. (A.R. 204.) Dr. Peterson noted a strong odor of alcohol and when he refused to provide him narcotics, Plaintiff left the ER.

Dr. O'Connor saw Plaintiff on August 29, 2000, when Plaintiff reported left leg pain running down to the knee, worsened by any activity, and mild low back pain. Neurologic exam was non-focal aside from having a negative straight leg raise. Plaintiff could bend over and touch his toes, and on standing up held his low back and complained of pain.  He had a slight limp on the left but it seemed somewhat exaggerated. Deep tendon reflexes were difficult to elicit, but 1+ and symmetrical, with downgoing Babinski's. Dr. O'Connor's impression was that Plaintiff's symptoms were more consistent with arthritis than nerve impingement and her plan was to send Plaintiff for neurologic evaluation. Dr. O'Connor provided Plaintiff with 20 Vicodin tablets. (A.R. 204, 214.)

On September 19, Dr. O'Connor noted Plaintiff was having difficulty setting an appointment with a neurosurgeon and with the pain clinic. She noted that the pain Plaintiff complained of was a little bit atypical because he complained that it was in the anterior shin and then went down the back of his legs when he becomes active.  Plaintiff reported that his pain, the numbness, and the mild low back pain resolved with Vicodin. (A.R. 214.)

Neurosurgeon Terry D. Kjerulf, M.D., examined Plaintiff at the request of Dr. O'Connor on September 26, 2000. (A.R. 217-19.) Dr. Kjerulf found that Plaintiff could stand without lumbar list or scoliosis and that there was no shift of the lumbar spine on forward flexion. Plaintiff had full forward flexion, fair lumbar extension, full lumbar rotation and lateral bending, and negative bilateral straight leg raise and Patrick's maneuver.  Dr. Kjerulf found that Plaintiff had full strength was throughout without drift and that his critical sensation was intact with some

subjective patchy changes in sensation in his lower extremities in a non-dermatomal or peripheral nerve pattern. Dr. Kjerulf found that the Romberg was negative and that Plaintiff's gait was narrow-based and stable. Dr. Kjerulf's impression was that Plaintiff suffered chronic pain involving the low back and lower extremities without any evident entrapment radiculopathy. Also, there did not appear to be any complex sympathetic reflex dystrophy. The doctor could not see any pathology on the MRI of the lumbar spine that would be amenable to surgical treatment. Dr. Kjerulf recommended a trial of better analgesic control by combining Oxycontin and Oxycodone, and treatment at a university pain clinic. (A.R. 218.)

On September 26, 2000, non-examining state agency physician Diane Rubin, M.D., opined that Plaintiff's mild disc bulge and degenerative disc disease of the spine resulted in an ability to lift and carry twenty pounds occasionally and ten pounds frequently, stand at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday, with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and with a need to avoid concentrated exposure to hazards (machinery, heights, etc.). Plaintiff's symptoms were attributable to a medically determinable impairment, but the severity or duration of the symptoms were disproportionate to the expected severity or duration on the basis of the claimant's impairments; inconsistencies and exaggerations in Plaintiff's claims were reviewed. Dr. Rubin was concerned about Plaintiff's "drug seeking behaviors."(A.R. 167-72, 171.) In October 2000 Plaintiff received more Vicodin. (A.R. 214.)

Plaintiff began receiving services from Central Washington Comprehensive Mental Health in November 2000, generally seeing Jeff Bannon,[4] BSCM, twice or more monthly. Also Plaintiff was evaluated and treated by Dr. Daniel Ferber, a psychiatrist. (A.R. 276-362.)

Dr. Ferber performed a psychiatric evaluation of Plaintiff on December 6, 2000. (A.R. 273-75.) Plaintiff complained of disabling, chronic leg pain; depression with irritability, feelings of hopelessness, poor concentration, and sleep difficulties. He reported that Oxycodone, Neurontin, Vicodin, Trazodone and Amitriptyline were not helpful. Plaintiff reported that two

---

[4] The signatures of the care provider are not fully legible.

9

years before, he had gone on a six-month to eight-month methamphetamine binge. During the exam, Dr. Ferber noted that Plaintiff displayed cooperative behavior and regular speech and, while he had no appearance of depression he had a slightly constricted affect.  Plaintiff demonstrated a linear and goal-directed thought processes expressed no hallucinations or suicidal ideations and he was cognitively alert with intact attention, concentration, and memory.  Dr. Ferber noted that Plaintiff had poor judgment and insight. Dr. Ferber believed that Plaintiff's history was consistent with anti-social personality disorder. Dr. Ferber's impression was that Plaintiff suffered from a mood disorder due to chronic pain, depressed type, alcohol abuse, methamphetamine abuse in sustained full remission, and anti-social personality disorder. Dr. Ferber determined that Plaintiff had a global assessment functioning (GAF) score of 50. Dr. Ferber recommended Plaintiff take Remeron.

Dr. David M. Sibell, from the Oregon Health Sciences University, evaluated Plaintiff in December 2000 for pain management. (A.R. 220-21.) Plaintiff reported that he had tried tricyclic antidepressants for six weeks but that they produced no substantial improvement.  On the other hand, Plaintiff reported that Remeron treated his depression well. (A.R. 220.) Plaintiff reported that it was not the left femur or mechanical back pain that principally bothered him; rather, it was his right leg pain that prevented him from working. (Id. ) Dr. Sibell opined that the pain was neuropathic and he suggested additional Gabapentin and, if unsuccessful, Topamax. (A.R. 221.)

Plaintiff visited the emergency room for back pain in mid-December 2000 and hand pain in later December. (A.R. 362-63.)

In 2001, Plaintiff continued to experience pain and sought medication for pain relief. In January 2001, Dr. O'Connor diagnosed depression and narcotic dependence; she prescribed Neurontin, Topiramate, and OxyContin. Plaintiff agreed not to seek additional narcotics for three months. (A.R. 213.) Nevertheless, in early February, Plaintiff sought narcotics from Dr. Peterson for hip pain and complained that his OxyContin had been stolen. Dr. Petersen refused to give Plaintiff narcotics but offered Flexeril for sleep. Plaintiff visited Dr. O'Connor about a week later. His examination at that time showed no range of motion tenderness in the right hip, which

Plaintiff reported was painful.  Dr. O'Connor refilled the OxyContin but again said that she would not refill it in the future. (A.R. 211.)

In February, Plaintiff reported to Dr. Ferber that Dr. O'Connor had discontinued the Remeron prescribed by Dr. Ferber and had prescribed Neurontin and Flexeril for pain.  Plaintiff reported that his pain did not improve. (A.R. 355.) Dr. Ferber discontinued psychotropic medications because Dr. O'Connor was managing the medications. (A.R. 355.) By late February 2001, Plaintiff's depression and anger had lessened, his mood was stable, and his interaction was good. (A.R. 357.)

In March 2001, Dr. O'Connor refilled OxyContin and prescribed Wellbutrin for severe depression and to facilitate cessation of smoking, with Celebrex for pain during the day. (A.R. 210.) X-rays revealed no abnormalities in the left leg. (A.R. 209.) On March 28, 2001, Plaintiff saw Dr. O'Connor and reported being in "unbearable" pain which started after he began walking more and doing some Tai Chi. (A.R. 209.)Nevertheless, Dr. O'Connor noted that Plaintiff rode his bicycle to the office.

In March 2001, Plaintiff reported to case manager, Jeff Bannon, that his sleep was better and that he was doing better with his depression.  At the time, his mood appeared stable and he reported that he was trying to regain his license so he could get a job. (A.R. 353-54.) In April, Plaintiff reported to Bannon that depression was "not bad" and that it caused him trouble one or two days per week. He had started a new medication. (A.R. 350-52.)

On April 16, 2001, at the request of the Department of Rehabilitation, Dr. Robert E. Schneider, Ph.D., examined and evaluated Plaintiff to assess his cognitive and intellectual functions and his ability to benefit from training. (A.R. 222-32.) Dr. Schneider stated that Plaintiff, who had a history of polysubstance abuse and was being treated for depression, had previously been diagnosed with an antisocial personality disorder and a mood disorder. Dr. Schneider found that Plaintiff was very bright, needed a career permitting activity and independence, and had moderate depression that appeared to be responding well to current medication and treatment. (A.R. 222.) Dr. Schneider diagnosed Plaintiff with dysthymic disorder,

adjustment reaction with depression, moderate and what appeared[5] to be a mixed personality

disorder with hysterical and antisocial features.  Dr. Schneider determined Plaintiff's GAF score

to be 60. (A.R. 232.)

Plaintiff attributed his depression to a volatile divorce producing emotional problems

during the past year.  He reported that his former wife had taken his property, had him arrested,

and disappeared with the stepchildren. He reported that Wellbutrin was helpful, as were the

sessions that he underwent with a psychologist twice a month for the last four to five months.

Plaintiff reported that his depression was improving. Plaintiff reported taking three Oxycontin two

to three times a day. (A.R. 223).

Plaintiff reported that he thought that he was previously diagnosed with antisocial

personality when he was in prison for burglary at age nineteen.  He noted also that he had been

jailed for a felony DUI. He completed drug and alcohol treatment in prison. (A.R. 223).

Plaintiff reported that he had stopped using drugs and alcohol three and one-half months

before but that he still used small amounts of recreational drugs. He reported that he was being

followed by staff at a state chemical dependency program. He claimed that he never had any

problems controlling his temper while working and that he could work with people or by himself.

Although his previous work in construction was seasonal, he stayed with one employer for three

years and with another for two. His current interest was becoming a veterinary assistant for large

animals.

Dr. Scheneider determined that the mental status exam revealed no evidence of depression,

anxiety, or any significant psychological impairment. Plaintiff's word usage, finding, and sentence

structure were within normal limits; he understood questions and could respond clearly and

coherently; he could follow complex, multi-step instructions and was very quick on all test

activities. On the Wechsler Adult Intelligence Scale-Revised, Plaintiff had a verbal IQ of 105 and

---

[5]Instead of simply stating a straightforward, definite diagnosis on this axis, Dr. Schneider wrote that there "appear to be many characteristics of an underlying personality disorder," catalogued Plaintiff's difficulties (his previous marriage, inability to sustain a relationship with a woman, trouble with legal authorities, and history of alcohol and drug abuse), and concluded, "It appears that a mixed personality disorder with hysterical and antisocial features provides the most useful description of his typical adjustment pattern." (A.R. 232.)

a performance IQ of 126, which Dr. Schneider concluded was an underestimate of his non-verbal intellectual abilities.  Instead, he felt Plaintiff scored in the superior range. (A.R. 130-140). Plaintiff's reasoning, problem solving, conceptual abilities, and general understanding were extremely high.  He was attentive to his environment and learned from his experience.  He was able to overcome some impulsivity with his high level of natural intelligence. He was extremely self-confident, had little insight or self-awareness and was emotionally undeveloped. He had excellent problem-solving skills and flexibility in solving problems. Tests involving focused attention were most difficult for Plaintiff. Dr. Schneider believed that he would function best not with formal education or passive learning, but rather active, involved learning. (A.R. 227-28.)

The MMPI-2 revealed a chronic, moderate depression with hysterical personality features and anger, that he exhibited significant defensiveness, and that his profile indicated difficulties adapting to a high level of structure and to authority figures.  This meant that Plaintiff would be best suited to work independently, such as with large animals. He did not appear to be a candidate for an office environment. Plaintiff's ego functions were within normal limits without any significant psychiatric impairment.  He reacted to stress by becoming somewhat disorganized. (A.R. 229.)

Dr. Schneider recommended continuing medication and treatment for moderate depression.  Dr. Schneider felt that the treatment should include addressing Plaintiff's anger over his divorce, monitoring drug and alcohol abuse and using non-narcotic pain medications with the help of a pain management program. (A.R. 232.)

In April 2001, Plaintiff was evaluated by Skip Ruppell, CDC, CCDVC, at Quest Counseling Services regarding his substance abuse.  Ruppell determined that Plaintiff's diagnosis was alcohol dependence, serious; amphetamine dependence, partial remission; cocaine dependence, in remission; heroin dependence, in remission, cannabis dependence, partial remission; and nicotine dependence.  Ruppell determined that Plaintiff's current GAF score was 45. (A.R. 270-72, 270.) Ruppell recommended outpatient treatment for chemical dependence, Level III.  Ruppell felt that Plaintiff's mental status was not significantly impaired and that he was

capable of insight, He felt that Plaintiff's his emotional status was low/moderate stress/anxiety/depression, with good rehabilitation potential with minimal support. (A.R. 270.) Beginning in April 2001 through May 2002, staff notes indicated that Plaintiff's was compliant with all aspects of treatment. (A.R. 257-69.)

In April and May 2001, Plaintiff expressed concern that he was becoming addicted to "oxycodone" and wondered if he should give it up altogether.  At the time, he was involved in counseling for depression. Dr. O'Connor encouraged him to take the medication and not worry about it. (A.R. 208, 207.) In early July 2001, Plaintiff sought Oxycodone before he should have needed it and Dr. Peterson refused to provide it. Nevertheless, later Plaintiff obtained further refills. (A.R. 206.)

In May 2001, Plaintiff reported doing better overall on his depression.  He discussed with his therapist filing for disability because of physical problems. (A.R. 349.) Plaintiff reported to his therapist that he preferred that Dr. Ferber prescribe medications for him rather than Dr. O'Connor. (A.R. 345-46.) He reported that he had good and bad days, but more good than bad. By the end of the month, he reported that his last week had been good, that he was doing better physically and was walking without much pain. (A.R. 343.) He reported that he continued to struggle with depression in June but was doing better with it in July. (A.R. 338-40.)

On July 16, 2001, Dr. Ferber prescribed Zyprexa and Serzone after Plaintiff was seen on an emergent basis for suicidal thoughts, suddenly depressed mood, insomnia, irritability, and loss of appetite that he had experienced since July 4, a day after he had used marijuana and alcohol. Plaintiff also reported having stopped his Oxycodone and Topamax the previous week because he believed he was becoming addicted and that the medications could contribute to his depression. (A.R. 336.) On July 17, Plaintiff reported that the new medications helped him sleep and improved his depression.  On July 18, he reported that his depression was only half of what it had been a couple of days before. His mood was stable. (A.R. 333-34.) Plaintiff continued to experience improvement of sleep and depressive symptoms in later July and in August. (A.R. 329-32.)

In August 2001, Dr. O'Connor directed that Plaintiff's OxyContin prescription not be filled because a urine drug screen was positive for cocaine, morphine, THC, methamphetamine, and amphetamine. (A.R. 247-49.) After examining Plaintiff on August 13, 2001, Dr. O'Connor ceased prescribing narcotics without Plaintiff's undergoing drug treatment.  Dr. O'Connor believed that Plaintiff's condition was stable and unlikely to improve. (A.R. 245.) Dr. O'Connor described Plaintiff's mental condition as major depression and identified it as his most significant disability with a severity rating of three.  She opined that his right lower extremity lumbo-sacral plexopathy causing paresthesias of the right leg had a disability rating of three, and his history of left femur fracture and low back pain had a severity rating of two. Dr. O'Connor reported that Plaintiff could perform part-time, light work but would not tolerate any work that was above light work.  She noted that Plaintiff had some slight decreases in range of motion but that he had no environmental or workplace restrictions that were nonexertional. (A.R. 244.)

In September 2001, Plaintiff's mood fluctuations had improved and Dr. Ferber adjusted Plaintiff's Zyprexa dose to treat problems with sleep disturbance. (A.R. 320.) Thereafter Plaintiff reported improvement in mood but continuing insomnia, and excessive sedation during the day. As a result, Dr. Ferber reduced the Zyprexa and prescribed Doxepin to treat Plaintiff's insomnia. (A.R. 318.) In October 2001, Plaintiff expressed a plan to go to school. (A.R. 314.) Instead he enrolled in long-term drug and alcohol treatment at Sun Ray Court, intending to stay for six months. (A.R. 313.)

In January 2002, Dr. Bothamley provided Plaintiff refills of Serzone for his depression. Plaintiff reported that he had attended an inpatient alcohol treatment program and had turned his life around.  He reported that he was seeing Dr. Ferber, who had put Plaintiff on Zyprexa and other psychiatric medications. (A.R. 242.) Plaintiff returned to Mental Health for out-patient treatment and reported that he felt better. His mood was stable. (A.R. 311-12.)

Shelli Filby, MA, therapist completed an adult assessment of Plaintiff on January 29, 2002. (A.R. 276-87).  The assessment noted that Plaintiff reported that he felt down and had disturbed sleep, low motivation, and a "social phobia." (A.R. 276.) He reported that pain

1   medications had been helpful. His mental status exam revealed no abnormalities except decreased

2   libido and fatigue (A.R. 277, 283.)

3          In February, Plaintiff reported to Dr. Ferber that he had been off alcohol for four months

4   and off methamphetamine and cannabis about seven months.  He reported that he had previously

5   been abusing his Oxycodone, illegal drugs and alcohol on and off since being seen at the mental

6   health clinic. He reported that he continued to have intermittent suicidal thoughts without a plan

7   and depressed moods when he thought about his living situation. He reported that he slept about

8   ten hours a day and that his depressive symptoms had improved. Dr. Ferber diagnosed him with

9   dysthymic disorder. Dr. Ferber concluded that many of Plaintiff's depressive symptoms were

10  exacerbated by his drug and alcohol abuse but it was unclear whether he was experiencing

11  auditory hallucinations. Dr. Ferber encouraged Plaintiff to increase Doxepin to handle the

12  hypersomnia and to enroll in a support group. (A.R. 309.) Plaintiff expressed a concern that

13  Serzone might cause liver damage. (A.R. 308.) Plaintiff was instructed to decrease the Serzone.

14  (A.R. 307.) In March, Plaintiff reported that overall, his depression was better with the

15  medications. (A.R. 306.)

16         On March 5, 2002, Dr. O'Connor evaluated Plaintiff's physical condition and his severe

17  depression. (A.R. 238-41.) She noted a non-tender back, non-focal neuro exam, and Plaintiff's

18  reported ability to walk half a mile before having pain.  She noted that Plaintiff took multiple

19  medications to control his depressive symptoms. She diagnosed him with lumbosacraplexopathy

20  with parasthesias, a history of multiple left leg fractures, chronic back pain, depression, and poly-

21  substance abuse. Dr. O'Connor believed that the substance abuse likely caused depression and

22  pain tolerance but that she had seen no improvement with abstinence. Plaintiff's range of motion

23  was normal but Plaintiff was not tolerating frequent use of the left leg or mobility with the lower

24  back. Dr. O'Connor noted that Plaintiff's history of illicit drug use and felony convictions affected

25  his ability to care for children. She believed that Plaintiff could work at least half days of light

26  duty work.  Also, Dr. O'Connor noted that Plaintiff needed treatment for his depression and that

27  past treatment had resulted in improved pain tolerance and abstinence from substance abuse.

28

On March 19, 2002, Plaintiff reported to Dr. Ferber that decreasing the dosage of Serzone resulted in him having more depressed moods. As a result, Dr. Ferber adjusted Plaintiff's medications and recommended that Plaintiff undergo a liver function test. (A.R. 304.) Plaintiff's lab serum tests from March 12, 2002, showed an elevated SGOT (53) and SGPT (135), but these levels did not require that he discontinue his medications although additional liver tests were recommended. (A.R. 303.) By the end of the month, Plaintiff was doing well in that he had only two days of depression that week. (A.R. 301.)

On April 2, 2002, Dr. O'Connor noted that Plaintiff had mild liver disease from alcoholism. (A.R. 237.) Plaintiff needed a liver function test to follow up on whether his medication was causing any worsening liver irritations. The exam showed no JVD, nontender abdomen, normal liver span, and no feelings of enlarged or tender liver. Dr. O'Connor diagnosed Plaintiff with hypertension, history of alcohol and drug abuse, severe depression, and history of liver disease but noted that all were currently stable. Dr. O'Connor prescribed medication for hypertension. (A.R. 237.) On April 30, 2002, Plaintiff reported to Dr. O'Connor that he was doing pretty well and that some of his psychiatric medications had been changed. A liver panel showed some evidence of hepatitis C and Plaintiff requested referral to a gastroenterologist for intervention. (A.R. 236.) Dr. O'Connor wrote that Plaintiff's liver function would be retested in six weeks to make sure there was improvement with the discontinuation of his psychiatric medications and to make sure that Tylenol, prescribed for pain, did not elevate his liver function test. (A.R. 236.)

In April 2002, Plaintiff reported to Jeff Bannan that he was doing well with his depression (2 on a scale of 1-5), but that he still experienced pain in the leg. (A.R. 300.) He reported that cutting the dosage of Zyprexa in half resulted in more depression. (A.R. 299.) His April 3, 2002, lab tests showed that his serum electrolytes and liver function test were within normal limits with the exception of an SGOT at 66 and SGPT of 150. On April 30, 2002, Dr. Ferber discontinued the Serzone because Plaintiff was having decreased sex drive and because it might have been contributing to elevated liver enzymes in view of Plaintiff's chronic hepatitis C. (A.R. 297.) By

the end of April, he was having two or three days of depression that he rated as a three on a scale of one to five. (A.R. 296.) In early May he reported having been off his medications for a week on doctor's orders with a plan to start new medications (Effexor XR) in another week. (A.R. 294-95.) In later May and June, he was doing better with the new medications, with depression at a two and then a one on a scale of one to five. (A.R. 288-93.)

Dr. Michael Capek reported that an abdominal ultrasound performed on May 8, 2002, in connection with clinical indications of Hepatitis C, revealed normal spleen, normal gallbladder with slightly thickened wall; mildly enlarged liver with no discrete hepatic lesions or evidence of hepatic mass or ascites; and no discrete mass or thickening of pancreas or adjacent fluid collection. (A.R. 256.)

On June 10, 2002, Plaintiff reported to Dr. O'Connor that his alcoholism, drug abuse, and depression were doing well while being managed by Dr. Ferber with Zyprexa, Ibuprofen, Singulair, Doxepin, and Vioxx (Serzone had been discontinued). (A.R. 235.)

On August 19, 2002, after last treating Plaintiff in July 2002, Dr. O'Connor reported that Plaintiff's hypertension, depression, hepatitis C, history of alcohol and drug abuse, and lumbosacraplexopathy caused back and leg pain and fatigue.  She noted that his Zyprexa caused weight gain. Also, Plaintiff took Vioxx, Effexor (which caused fatigue), HCTZ, and Atenolol.  He reported that his back and leg pain and severe depression caused pain. He reported that the back and leg pain were stable. Dr. O'Connor stated that Plaintiff would not likely tolerate physical labor and he would miss on an average four days or more per month due to fatigue. Plaintiff had suffered these limitations for more than five years. (A.R. 233-34.)

On October 20, 2003, Dr. Thomas B. Bryan, who was board certified in pain medicine and neurology and had treated Plaintiff since September 8, 2003, reported concerning Plaintiff's pain and numbness, chronic anxiety and depression, poor sleep, and restless leg syndrome. (A.R. 368-69.) Plaintiff was treated with Trazadone and Prozac for depression and insomnia; Clonazepam for restless legs; Topamax for nightmares and post-traumatic stress disorder; and Ultram for the right leg pain. Plaintiff had undergone a severed right radial nerve repair for numbness in the right

posterior hand area. Although Plaintiff had improved since Dr. Bryan began caring for him,

Plaintiff continued to have bouts of severe depression and had reached maximum improvement.

Dr. Bryan wrote that he felt that Plaintiff was unable to be gainfully employed due to Plaintiff's

fragile psychiatric condition, reflex sympathetic dystrophy into the right leg that worsened even

with moderate physical activity, and bouts of self-destructive behavior when irritable and

depressed. He feared that regular and continuous work would cause deterioration of Plaintiff's

condition and more depression and anxiety. Even minor stress would cause Plaintiff to

decompensate, although Plaintiff could handle his financial affairs. (A.R. 368-69, 371-72.)

Treatment notes from Dr. Bryan from September 2003 through February 2004 (A.R. 373-77) are

generally illegible but reflect complaints in September 2003 or a reported history of poor sleep,

somnambulism, hypertension, depression, and self-medication.

On February 10, 2004, Dr. Bryan reported that he had seen Plaintiff from September 2003

through February 2004. (A.R. 366-67, 371-72.) His primary diagnosis was reflex sympathetic

dystrophy (regional pain syndrome) into the right leg, with poor prognosis; depression; anxiety;

and sleep disorder. Plaintiff's symptoms were severe pain from the right groin down the right leg,

pain from the left knee to foot, and right low back pain into the right hip. Plaintiff's extremities

were cold, with worse symptoms on the right. Plaintiff had to lie down after being up for one and

one-half hours and stayed lying down as much as he could. Plaintiff had received Prozac,

Doxepin, Trazodone, and Effexor for depression; Clonazepam for sleep and anxiety; Wellbutrin

and Seroquel for anxiety; and Vicodin, Topamax, Ultram, Neurontin, and Glucosamine for

chronic pain. Dr. Bryan opined that Plaintiff was unable to work for even two hours in a day due

to pain that had progressed since 1998.

On an unsigned and undated form for medical evaluation for in-home supportive services,

Dr. Bryan appeared to list an additional diagnosis, namely, PTSD, and stated that Plaintiff could

safely remain in his own home without in-home care. (A.R. 370.)

V.     Treatment of Expert's Medical Opinions

Plaintiff challenges the adequacy of the ALJ's reasoning concerning the medical opinions

1  of various medical experts who treated Plaintiff. Some of Plaintiff's challenges concern findings

2  relating to the severity of impairments at step two of the sequential disability analysis.  Other

3  challenges relate to findings primarily, or also relevant to, formulating Plaintiff's RFC and

4  considering the availability of work at steps four and five. Regardless of the stage of the disability

5  analysis involved in any particular challenge, Plaintiff's arguments concern the opinions of

6  treating experts and thus must be considered in light of the legal principles governing an ALJ's

7  evaluation of such opinions.

8              A.     Legal Principles Governing Opinions of Treating Sources

9          The standards for evaluating the opinions of treating source's recently have been

10  comprehensively restated.

11          By rule, the Social Security Administration favors the opinion of a treating
          physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating
12          physician's opinion is "well-supported by medically acceptable clinical and
          laboratory diagnostic techniques and is not inconsistent with the other substantial
13          evidence in [the] case record, [it will be given] controlling weight." Id. §
          404.1527(d)(2). If a treating physician's opinion is not given "controlling weight"
14          because it is not "well-supported" or because it is inconsistent with other
          substantial evidence in the record, the Administration considers specified factors in
15          determining the weight it will be given. Those factors include the "[l]ength of the
          treatment relationship and the frequency of examination" by the treating physician;
16          and the "nature and extent of the treatment relationship" between the patient and
          the treating physician. Id. §  404.1527(d)(2)(i)-(ii). Generally, the opinions of
17          examining physicians are afforded more weight than those of non-examining
          physicians, and the opinions of examining non-treating physicians are afforded less
18          weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional
          factors relevant to evaluating any medical opinion, not limited to the opinion of the
19          treating physician, include the amount of relevant evidence that supports the
          opinion and the quality of the explanation provided; the consistency of the medical
20          opinion with the record as a whole; the specialty of the physician providing the
          opinion; and "[o]ther factors" such as the degree of understanding a physician has
21          of the Administration's "disability programs and their evidentiary requirements"
          and the degree of his or her familiarity with other information in the case record.
22          Id. § 404.1527(d)(3)-(6).

23
  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). With respect to proceedings under Title XVI, the
24
  Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.
25
          Further, the ALJ's reasoning concerning his weighing of the opinions must be legally
26
  sufficient.
27
          The opinions of treating doctors should be given more weight than the opinions of
28

20

doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 830, quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes [v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.1988). Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

The Court rejects Plaintiff's contention that the ALJ was required to state clear and convincing reasons with respect to the experts' opinions as to Plaintiff's RFC that were not fully adopted. Here, the record contained opinions from Drs. Staley and O'Connor to the effect that Plaintiff could perform light work. (A.R. 244-245, 185-92.) Therefore, in weighing the contradictory opinions, the ALJ was only required to state reasons that were specific and legitimate.

### B.   Findings concerning the Severity of Plaintiff's Impairments

The ALJ noted Plaintiff's diagnoses of hepatitis C and personality disorder but the ALJ found that only Plaintiff's fractured left leg, chronic bilateral leg pain, and depression were severe impairments. The ALJ thus impliedly found that Plaintiff's hepatitis and personality disorder were not severe impairments.

At step two, the Commissioner considers if claimant has "an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). This is referred to as the "severity" requirement and does not involve consideration of the claimant's age, education, or work experience. Id. The step-two inquiry is a de minimis screening device to dispose of groundless claims. Bowen v. Yuckert, 482 U.S. 153-54 (1987). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately,

would be of [sufficient medical] severity." 42 U.S.C. § 1382c(a)(3)(F).

Basic work activities include the abilities and aptitudes necessary to do most jobs, such as physical functions of walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b).  An impairment or combination thereof is not severe when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.921(a); Soc. Sec. Ruling 85-28; Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996).

1.     Hepatitis

Plaintiff challenges the ALJ's implied finding that Plaintiff's hepatitis was not severe. Plaintiff argues that the ALJ failed to state valid reasons for his rejection of the opinion of treating physician O'Connor that Plaintiff would lose four days a month due to fatigue from hepatitis.

The ALJ discussed Plaintiff's diagnosis of hepatitis C at various points in his decision and discussed the opinions of Dr. O'Connor, on whose opinion Plaintiff relies in asserting that the ALJ's reasoning concerning severity was erroneous. The Court will consider the entirety of the ALJ's decision concerning the impairment in determining the adequacy of the reasoning.

The ALJ reviewed the history of Dr. O'Connor's treatment of Plaintiff, setting forth details which find substantial support in the record. The ALJ noted Dr. O'Connor's treatment of Plaintiff from May 2000 through at least July 2002.  The ALJ specifically recited the substance of Dr. O'Connor's opinions of August 13, 2001 (A.R. 244-45), March 5, 2002[6] (A.R. 238-41) and

---

[6] The ALJ expressly noted that the opinion of March 5, 2002, was given in response to a query on an evaluation form seeking information regarding at what exertional level an individual could perform work at least half-time, and that there was nothing on the form that would indicate whether the claimant could or could not do light work full-time. (A.R. 20.)

1   August 19, 2002 (A.R. 233-34), to the effect that Plaintiff could perform light work, which in

2   some but not all instances was expressly limited to part-time work, and that Plaintiff "would not

3   likely tolerate physical labor." (A.R. 20-21, 233-34.) The ALJ identified the objective, supporting

4   documentation entered on the form dated March 5, 2002, as a non-tender back; non-focal

5   neurological findings; and somewhat limited range of motion of the back and lower extremities

6   with ten degrees of extension, twenty-five degrees of lateral flexion of the back bilaterally, thirty

7   degrees of hip abduction bilaterally, and fifteen degrees of hip adduction on the left. (A.R. 20,

8   238-40.) The ALJ further noted that in the opinion of August 19, 2002, Dr. O'Connor failed to

9   define the term "physical labor." (A.R. 21, 233-34.)

10          The ALJ then further discussed Dr. O'Connor's statements concerning fatigue:

11          She also indicated that the claimant was taking Effexor which caused fatigue and
            that the claimant would miss work four or more days a month due to fatigue. When
12          asked to describe in detail the relevant clinical findings and test results, Dr.
            O'Connor only stated, "Weight gain with Zyprexa." (Exhibit 16F, pp. 1-2 [A.R.
13          233-34].) The claimant's mental health treatment records from Central Washington
            Comprehensive Mental Health reflect that he did not start taking Effexor until May
14          2002 (Exhibit 18F, p. 22 [A.R. 294]) after he complained of fatigue while taking
            Serzone in April 2002 (Exhibit 18F, p. 25 [A.R. 297]). Subsequent treatment
15          records do not show any complaints of fatigue or other side-effects from Effexor,
            and the claimant's depression also lessened after he started taking it (Exhibit 18F,
16          pp. 16-21 [A.R. 288-93]). Consequently, Dr. O'Connor's statement regarding
            fatigue related to Effexor appears to be inaccurate. Further, Dr. O'Connor's
17          treatment records prior to the August 19, 2002 questionnaire do not include any
            references to fatigue. In fact, in April 2002 when discussing the claimant's
18          hepatitis C, she noted, "His energy is good" (Exhibit 16F, p. 4 [A.R. 236]). Her
            treatment notes also fail to reveal any objective basis for restricting the claimant to
19          less than full-time light work.[7]

20   (A.R. 21.)

21          The ALJ then reviewed multiple comments and observations of Dr. O'Connor reflected in

22   the record that cast doubt on the severity of Plaintiff's symptoms, including a notation at or about

23   the time of initial contact in May 2000 that Plaintiff's pain seemed to be out of proportion to his

24   clinical findings and exam and that Plaintiff might have been abusing his medications (A.R. 195);

25   her statement of August 29, 2000, in which she noted that Plaintiff's limp on the left side seemed

26

27          [7] In this section, parallel citations to the presently constituted administrative record are provided in brackets
     next to the ALJ's citations to the record for easy reference to the portions of the record that support the ALJ's
28   statements.

1   somewhat exaggerated (A.R. 204), and her note on September 19, 2000, that Plaintiff's leg pain

2   was a little bit atypical (A.R. 214); her report on February 14, 2001, that Plaintiff's limited range

3   of motion in his extremities was secondary to non-compliance with the exam (A.R. 211);

4   Plaintiff's statement of March 15, 2001, that he was able to return to some active labor activities,

5   was very eager to return to work, and did not want to take a narcotic during the day because it

6   would affect his ability to drive and interfere with his desire to become a machinist or heavy

7   equipment operator (A.R. 210); Plaintiff's having bicycled to the doctor's office on March 28,

8   2001, even though he complained of left leg pain described as unbearable (A.R. 209); the doctor's

9   note on April 12, 2001, that Plaintiff wanted to go back to school and start riding horses, and that

10  Plaintiff had a long history of drug-seeking behavior (A.R. 208); Plaintiff's statement to her on

11  May 10, 2001, that he was trying to increase his exercise and work activities (A.R. 207);

12  Plaintiff's urine screen of August 7, 2001, reflecting positive results for cocaine, morphine, THC,

13  methamphetamines, and amphetamines, and the doctor's refusal to prescribe further Oxycodone

14  because of abuse of illicit drugs (A.R. 246); and Dr. O'Connor's mention in the physical

15  evaluation of March 5, 2002, that Plaintiff could walk almost half a mile before he experienced

16  pain (A.R. 21, 238).

17          In the course of discussing Plaintiff's RFC and concluding that no combination of

18  impairments would rule out full-time, light work, the ALJ stated,

19          Although the claimant also has a diagnosis of hepatitis C, there has been no
            treatment for this condition. The most recent reference to hepatitis in Dr.
20          O'Connor's treatment records indicates that the claimant's energy was good
            despite some elevated liver function tests. She anticipated that these test results
21          would improve with changes in his psychotropic medication.

22  (A.R. 22.)

23          The ALJ appropriately relied on the absence of supporting evidence in the treatment notes.

24  It is established that a conclusional opinion that is unsubstantiated by relevant medical

25  documentation or clinical findings may be rejected. It is appropriate for an ALJ to consider the

26  absence of supporting findings, and the inconsistency of conclusions with the physician's own

27  findings, in rejecting a physician's opinion. Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir.

28

1    1995); <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992); <u>Magallanes v. Bowen</u>, 881 F.2d

2    747, 751.

3           Here, the absence of any treatment in the record for Plaintiff's hepatitis supports a rational

4    inference that his hepatitis did not have a sufficient impact on Plaintiff's functioning to warrant

5    treatment. This reasoning is specific and legitimate.

6           Further, substantial evidence supports the finding that the recent records of Dr.

7    O'Connor's treatment showed good energy despite elevated readings on liver tests.  In April 2002,

8    Plaintiff sought a referral to a gastroenterologist for his hepatitis, shown by some elevated liver

9    function tests.  Plaintiff reported that his energy was good, and the doctor planned follow-up in

10   the form of liver functions tests to "make sure that they continue to decline with the

11   discontinuation of his psych meds and to make sure that the Tylenol does not elevate his liver

12   function test...." (A.R. 236.) This reasoning was specific and legitimate.

13          With respect to Dr. O'Connor's specific opinion of August 2002 that Plaintiff suffered

14   fatigue and would lose four days per month because of it (A.R. 233-34), the Court notes that in

15   the opinion, the doctor did not specify any specific cause of fatigue except Effexor. The ALJ

16   reasoned that the assertion that Plaintiff suffered fatigue from Effexor was inaccurate because

17   Plaintiff did not start taking it until May 2002, when he had complained of fatigue from Serzone

18   in April 2002.  Thereafter, the treatment records do not reflect complaints of fatigue or any other

19   side-effects from Effexor. The absence of treatment records reflecting complaints of fatigue from

20   Effexor is specific and legitimate in the context of this case.

21          Plaintiff attacks the ALJ's statement concerning evidence of fatigue, namely, that Dr.

22   O'Connor's records of treatment before August 19, 2002, did not include any references to

23   fatigue. (A.R. 21.) Plaintiff points to references to fatigue that appear in the treatment records that

24   he asserts show the error of the ALJ's reasoning. Some of those notes pertain to treatment by

25   doctors other than Dr. O'Connor, such as Dr. Bothamley's note of February 16, 2000, that

26   Plaintiff reported that his Amitriptyline made him quite drowsy (181), Dr. Sibell's letter of

27   December 18, 2000, which referred to Plaintiff's complaints of more daytime sedation with his

28

medication of Remeron and/or Gabapentin (A.R. 220), Dr. Ferber's reference in the evaluation of December 2000 to depressive symptoms accompanied by "feelings of hopelessness and fatigue consistent with mood disorder" (A.R. 275), therapist Shelli Filby's check mark of January 2002 put next to "Fatigued" with respect to energy (A.R. 283) at a time when Plaintiff reported that he was taking Serzone (A.R. 277), a case manager's note in September 2001 that Plaintiff had been feeling sedated during the day and needed medication management with Dr. Ferber (A.R. 315), Dr. Ferber's note of September 19, 2001, that Plaintiff's poor sleep (awakening every hour or so throughout the night) resulted in Plaintiff's feeling fatigued during the day, and Dr. Ferber's note of October 2001 that since Plaintiff had increased his Zyprexa dose, he had been experiencing excessive sedation during the day (A.R. 318). Such references are from other doctor's notes and thus do not directly contradict the ALJ's statement concerning the specific absence of indications of fatigue in the treatment notes of Dr. O'Connor herself. Further, the notes generally relate to specific medication management problems and do not appear to be linked causally or otherwise to Plaintiff's hepatitis. The medications in question are medications that were subsequently discontinued or adjusted.

One reference is not from a treatment note, but rather is from Dr. O'Connor's own opinion of August 19, 2002, in which the doctor herself, as distinct from Plaintiff, refers to fatigue as a symptom of Plaintiff almost a month after the last day of treatment. (A.R. 233.) This notation thus does not logically undermine the ALJ's reasoning.[8]

The ALJ's reliance on the absence of any findings, clinical or otherwise, that Plaintiff suffered debilitating fatigue (A.R. 21), and the contradictory note of April 2002 recording Plaintiff's good energy, constituted further specific and legitimate reasoning based on the inconsistency of the supporting record with the expert's opinion. The ALJ also mentioned Dr. O'Connor's statement of August 19, 2002, that Plaintiff did not need to lie down during the day. (A.R. 24.)

---

[8] The Court is confused by the reference in Plaintiff's brief to the decision of "ALJ Dethloff," and to "Tr. 28" as a page of reasoning concerning infrequent fatigue (Brief p. 15, ll. 13-19); A.R. 28 is a notice of hearing, and ALJ Dethloff did not author the decision under review.

The Court also finds specific and legitimate the ALJ's reliance on material in the treatment notes which cast doubt on the severity of Plaintiff's symptoms. (A.R. 21, 24.) In addition to the catalogue of Dr. O'Connor's notes on the subject, the ALJ also mentioned Plaintiff's own report concerning his functionality made when he filed his claim, in which Plaintiff reported a "broad and relatively normal range of daily activities" that included cooking, cleaning, yard work, mechanical work on automobiles, riding a bicycle, shopping for groceries, and washing dishes. (A.R. 24, 20) Where a treating source's opinion is based largely on the Plaintiff's own subjective description of his symptoms, and the ALJ has discredited the Plaintiff's claim as to those subjective symptoms, the ALJ may reject the treating source's opinion. Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989). Further, it is permissible to rely on the Plaintiff's testimony regarding his impairments and on the Plaintiff's activities of daily living in discrediting a treating physician's opinion. Fisher v. Schweiker, 568 F.Supp. 900, 903 (N.D.Cal. 1983); Nguyen v. Commissioner of Social Security, 2008 WL 859425, *8 (E.D.CA March 28, 2008).

Here, the ALJ ultimately concluded that Plaintiff's subjective complaints of more severe physical and mental limitations, including fatigue, were not reliable (A.R. 24), and Plaintiff has not challenged the ALJ's findings concerning Plaintiff's credibility. The ALJ's reliance on this factor to reject opinions of more severe limitations was specific and legitimate.

Finally, the Court concludes that the ALJ's reliance on the ambiguity of Dr. O'Connor's opinion that Plaintiff would not likely tolerate "physical" labor was specific and legitimate. To the extent that medical evidence is inconsistent, conflicting, or ambiguous, it is the responsibility of the ALJ to resolve any conflicts and ambiguity. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999). Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

The Court concludes that the ALJ stated specific, legitimate reasons for not giving controlling weight to Dr. O'Connor's opinions and for concluding that Plaintiff had not demonstrated that his hepatitis C was a severe impairment.

2. Personality Disorder

1   The ALJ averred to the diagnoses or impressions of personality disorder by Drs. Ferber

2   and Schneider (A.R. 20), but in determining that the only mental impairment that was severe was

3   Plaintiff's depression (A.R. 19), the ALJ impliedly found that any personality disorder was not

4   severe. Plaintiff challenges this finding as unsupported by valid reasons.

5       With respect to Plaintiff's personality disorder, the ALJ stated,

6       Although Dr. Daniel Ferber also diagnosed an anti-social personality disorder, this
        appears to have been based primarily on the claimant's history of criminal and
7       disruptive behavior. The claimant told Dr. Ferber that he had lived with an aunt
        and various friends and had previously been married for seven years. He was
8       cooperative and  made good eye contact during the mental status examination
        (Exhibit 18F, pp. 1-3). A psychological evaluation by Robert Schneider, Ph.D.,
9       also led to an impression of a personality disorder with anti-social features, but the
        claimant told Dr. Schneider that he got along well with others (Exhibit 15f, pp. 10-
10      11). The claimant did not testify of (sic) any problems getting along with others
        and even stated that he went to church occasionally with his mother during the
11      period he claims to have been disabled.

12  (A.R. 20.)

13      The ALJ noted that Plaintiff's history of criminal and disruptive behavior was the basis of

14  Dr. Ferber's opinion.  He then compared this to the absence of noteworthy difficulties in

15  Plaintiff's reports and the testimony and evidence concerning Plaintiff's reported social

16  interactions interaction with family and associates. These records support the ALJ's conclusion

17  that any personality was not severe.

18      For example, Dr. Ferber referred to Plaintiff's "long history beginning in his teenage years

19  of antisocial behaviors" (A.R. 274).  The behaviors listed were five DWI convictions and abuse of

20  drugs and alcohol as a teenager, armed robbery and burglary convictions in 1979, a DWI two

21  years before Dr. Ferber's exam in December 2000, and methamphetamine usage as late as two

22  years before the exam (A.R. 273-75).  Conversely, Plaintiff reported to Dr. Ferber that he had

23  traveled extensively while working in construction, temporarily lived with an aunt, lived for two

24  years with various friends, and was married for seven years before his divorce. (A.R. 274.) In the

25  mental status exam, Plaintiff was cooperative and had good eye contact. (A.R. 274.)

26      With respect to the severity of Plaintiff's impairment, the ALJ noted that Dr. Ferber,

27  Plaintiff's treating psychiatrist, had not expressed any specific limitations with respect to

28

1   Plaintiff's ability to perform work. (A.R. 23.) Dr. Ferber had assessed a GAF of 50 in December

2   2000 (A.R. 275) and a different clinician assigned a GAF score of 60 in January 2002 (A.R. 287,

3   276-87). A GAF is a report of a clinician's judgment of an individual's overall level of

4   functioning and is used to plan treatment and to measure the impact of treatment as well as

5   predicting its outcome. American Psychiatric Association, Diagnostic and Statistical Manual of

6   Mental Disorders at 30 (4th ed.) A GAF of 50 (i.e., in the range of 41-50) indicates serious

7   symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious

8   impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

9   DSM-IV-TR at 34. A GAF within the range of 51 through 60 indicates moderate symptoms (e.g.,

10  flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,

11  occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. A

12  GAF score may be considered in connection with determining the nature and extent of an

13  impairment and the credibility of pain testimony. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.

14  2001). A GAF score does not have a direct correlation to the severity requirements in the SSA

15  listings of mental disorders. Revised Medical Criteria for Evaluating Mental Disorders and

16  Traumatic Brain Injury, 65 F.R. 50746, 50764-65 (August 21, 2000).

17          The ALJ noted that the mental status exam, performed at the time of the first evaluation by

18  Dr. Ferber, reflected largely unremarkable results. Plaintiff was appropriately groomed and

19  dressed, cooperative, and made good eye contact.  He did not appear depressed, was alert, and was

20  able to follow the doctor's questions.  His speech was regular in rate and rhythm and his memory,

21  attention, and concentration were intact.  Although his affect was slightly restricted, his thought

22  processes were linear and goal-directed, and he had no homicidal or suicidal ideations,

23  hallucinations, or delusions.  Based on Plaintiff's history of drug abuse and legal difficulties, Dr.

24  Ferber believed Plaintiff's insight and judgment to be poor. (A.R. 23, 274.) The ALJ relied more

25  extensively on the later assessment in January 2002, which reflected almost mild restrictions.

26  (A.R. 23, 276-87.) He also cited the most recent records from June 2002 indicating that Plaintiff

27  was doing "ok with some depression only a one or two for a few days on a scale of one to five."

28

1   (A.R. 288.)

2       The Court concludes that the inconsistency of the clinical signs noted in Dr. Ferber's

3   examination with Dr. Ferber's evaluation, and the inconsistency of the more recent reports,

4   constituted specific, legitimate reasons for the ALJ's weighing of Dr. Ferber's earlier opinion.

5       With respect to Dr. Schneider's evaluation, the ALJ again relied on Plaintiff's inconsistent

6   reports to Dr. Schneider concerning his getting along well with others. (A.R. 20.) Plaintiff had

7   told Dr. Schneider that he had no difficulty when working, had never lost his temper, had worked

8   in positions that included lead, foreman, and supervisory jobs, and he had worked for single

9   employers for two or three years. (A.R. 223-24.) The ALJ noted also Plaintiff's testimony which

10  was devoid of any problems getting along with others and reflected his visits to church with this

11  mother. (A.R. 20, 412-33, 419.) The record thus supports this specific, legitimate reasoning.

12      The ALJ stated that Dr. Ferber reported that Plaintiff's attention and concentration were

13  intact. (A.R. 20, 274) Also, Dr. Schneider concluded after administering the WAIS-R, WRAT-

14  Revised, MMPI-2 and other tests, that Plaintiff could follow complex, multi-step instructions and

15  quickly perform all test activities. (A.R. 20, 222, 226.) The ALJ noted that Dr. Schneider felt that

16  Plaintiff could perform complex, detailed, manual activities. (A.R. 24, 230.)

17      This reasoning concerning the underlying objective medical data was likewise specific and

18  legitimate. The ALJ cited evidence that supported a conclusion that Plaintiff suffered no

19  significant limitation of his physical or mental abilities and aptitudes necessary to do most jobs,

20  including but not limited to understanding, carrying out, and remembering simple instructions,

21  and appropriately interacting with others in the work place.

22      The ALJ also noted the evaluation at Quest Counseling Services in April 2001, which

23  reflected serious alcohol dependence and dependence on other drugs in various stages of

24  remission, and which resulted in assignment of a GAF score of 45, which indicated serious

25  symptoms or impairments in functioning. (A.R. 24, 270-72.) The ALJ stated he gave it no weight

26  because the evaluation form inconsistently indicated that Plaintiff's mental status was not

27  significantly impaired. (A.R. 24, 271.) Further, there was no mental status exam reported in the

28

1    records, the assessment did not appear to have been performed by a physician or psychologist, and

2    the assessment was based entirely on substance dependence, which appeared to have been

3    successfully treated during Plaintiff's attendance at the rehabilitation program from October 2001

4    through January 2002. (Id.)

5          The ALJ's reliance on the status of the evaluator was specific and legitimate. The fact that

6    a medical opinion is from an acceptable medical source is a factor that may justify giving that

7    opinion greater weight than other sources because acceptable medical sources are the most

8    qualified health care professionals. 20 C.F.R. §§ 404.1513(a), 416.913(a); Soc. Sec. Ruling 06-

9    03p. For the purposes of this case, acceptable medical sources include licensed physicians and

10   licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). The record reflects that

11   Skip Ruppell was not identified as a licensed physician or licensed or certified psychologist. (A.R.

12   271) Moreover, at the time Plaintiff's substance abuse appeared to be in remission.  Thus, the ALJ

13   legitimately reasoned that an assessment unsupported by clinical findings and based solely on

14   Plaintiff's substance abuse was not entitled to any weight.

15         In summary, the Court concludes that the ALJ stated specific, legitimate reasons that were

16   supported by substantial evidence for his evaluation of the expert opinions bearing on the severity

17   of Plaintiff's impairments and for concluding that Plaintiff's hepatitis and personality disorder

18   were not severe impairments at step two.

19                     C.     Dr. Bothamley's Opinion

20         In determining Plaintiff's RFC,[9] the ALJ considered the opinion of Dr. William Bothamley

21   in January 2000 that Plaintiff could perform only sedentary work, but the ALJ gave little weight to

22

23         [9] Social Security regulations define residual functional capacity as the "maximum degree to which the
24   individual retains the capacity for sustained performance of the physical-mental requirements of jobs." Reddick v.
     Chater, 157 F.3d 715, 724 (9th Cir. 1998) (citing 20 C.F.R. 404, Subpt. P, App. 2 § 200.00(c) and Lester v. Chater,
25   81 F.3d 821, 833 (9th Cir. 1995)). The Commissioner must evaluate the claimant's "ability to work on a sustained
     basis." Id. (citing 20 C.F.R. § 404.1512(a)); Lester, 81 F.3d at 833); see 20 C.F.R. § 416.945. A "regular and
26   continuing basis" means eight hours a day, five days a week, or an equivalent work schedule. S.S.R. 96-8p at 1, 2.
     The process involves an assessment of physical abilities and then of the nature and extent of physical limitations with
27   respect to the ability to engage in work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b).
     Occasional symptom-free periods and even the sporadic ability to work are not inconsistent with disability. Reddick
28   v. Chater, 157 F.3d at 724.

1   the opinion for several reasons. (A.R. 22-23, 162.) The record supports the ALJ's reasoning that

2   the doctor had limited familiarity with Plaintiff's condition at the time.  It appears that he treated

3   Plaintiff only one time on January 11, 2000 (A.R. 180-82), before rending his opinion on January

4   27, 2000. (A.R. 161-64).  In doing so, the doctor made clear that he had not reviewed any past

5   medical records. (A.R. 162).  It is appropriate for an ALJ to rely on an absence of a longitudinal

6   history in discounting an expert's opinion. <u>Cansio v. Shalala</u>, 833 F.Supp. 764, 768 (C.D.CA

7   1993).

8         Likewise, the record supports the ALJ's conclusion that the objective findings from Dr.

9   Bothamley's examination of Plaintiff were minimal, including intact sensation and motor function

10  in both lower extremities despite weak reflexes and full range of motion in the lower extremities.

11  (A.R. 22-23, 180, 161.) Finally, the record supports the ALJ's reasoning that Dr. Bothamley, who

12  had reviewed no medical records and had not performed any tests beyond a physical examination

13  of Plaintiff, relied on Plaintiff's subjective complaints of limitations in evaluating Plaintiff's

14  capacity. (A.R. 22-23, 161-62, 180-81.) As previously noted, such reasoning is legitimate.

15        Plaintiff argues that the ALJ's treatment of Dr. Bothamley's opinion was not sufficiently

16  specific because the ALJ did not explain how the objective findings were unsupportive of the

17  opinion or how the ALJ concluded that Dr. Bothamley apparently relied on Plaintiff's own

18  complaints to form his opinions. The Court disagrees. The ALJ referred to an absence of

19  abnormal findings and specifically identified the findings that were inconsistent with the extent of

20  the claimed limitations. Further, the record reflects that it was Plaintiff's reports or complaints

21  that were recorded, as distinct from objective evidence such as test results. The ALJ considered

22  and expressly relied on the short treatment relationship and limited knowledge available to the

23  doctor. Given the ALJ's comprehensive review of the medical evidence and articulation of

24  express reasons, the Court rejects Plaintiff's contention that the ALJ's reasoning concerning Dr.

25  Bothamley was too vague. The Court concludes that the ALJ stated specific, legitimate reasons for

26  placing little weight on the opinion.

27        D.     Dr. Bryan's Opinion

28

1    The ALJ considered Dr. Thomas Bryan's questionnaire, provided by Plaintiff's

2    representative, in which the doctor opined that Plaintiff had to lie down after being up for one and

3    one-half hours, was psychologically fragile and self-destructive, and was unable to work for even

4    two hours a day. (A.R. 23.) The ALJ gave little weight to the opinion because when asked to

5    provide in detail the relevant clinical findings and test results, Dr. Bryan cited only "Cold

6    extremities–legs-worse on R." (A.R. 23, 371-72, 371.) The ALJ also noted the absence of any

7    treatment records from Dr. Bryan to document any other objective basis for the extreme

8    limitations. (A.R. 23.) Plaintiff has not cited to any entries in the record of Dr. Bryan's treatment

9    (A.R. 365-79) that would constitute an objective basis for the doctor's limitations. The ALJ also

10   noted that Dr. Bryan stated in his letter of October 20, 2003 (A.R. 368), that he had been seeing

11   Plaintiff since September 8, 2003.  However, Dr. Bryan did not indicate whether he had seen

12   Plaintiff between those dates, so it was unclear whether he had examined Plaintiff more than

13   twice.

14   The ALJ's consideration of the apparently limited observation by the doctor and of the

15   paucity of objective findings was appropriate and legitimate considering the ALJ's determination

16   concerning Plaintiff's subjective complaints and the nature of Plaintiff's impairments.

17        E.        Opinions of Drs. Schneider and Ferber

18   Plaintiff argues that the ALJ simply cited portions of these doctor's opinions that showed

19   ability, such as high intelligence, and ignored the portions of the evaluation that showed inability,

20   such as poor judgment, poor sustained concentration, volatile personality traits, difficulty adapting

21   to structure, etc. (Brief. at p. 16.) Plaintiff argues that the ALJ failed to explain why he rejected

22   "other mental health limitations," which he enumerates as "difficulty tolerating a structured

23   environment, volatile personality, poor judgment, lack of sustained attention, etc."

24   The ALJ's reasoning concerning the opinions of Drs. Schneider and Ferber has been

25   evaluated hereinabove (Part V(B)(2), pp. 38-43) in connection with Plaintiff's contention

26   concerning the severity of Plaintiff's personality disorder. Plaintiff's present argument about the

27   ALJ's not imposing additional limitations due to Plaintiff's combined mental impairments relates

28

1   to the ALJ's findings concerning Plaintiff's RFC. In limiting the weight put on these doctors'

2   opinions, the ALJ relied on specific, legitimate reasons supported by substantial evidence in the

3   record, including activities of daily living that involved skills and pursuits transferable to a work

4   setting, Dr. Schneider's test results, Dr. Ferber's findings, Plaintiff's inconsistent reports of his

5   social history and the nature of the treatment for Plaintiff's disorders. (AR. 20.)

6          Further, the ALJ specifically addressed the opinions in connection with Plaintiff's RFC.

7   (A.R. 23-24.) The ALJ relied on Dr. Schneider's determination that Plaintiff's GAF score was 60

8   which noted that it was on the borderline of moderate and mild symptoms or functional

9   difficulties.  He relied also on Dr. Schneider's assessment that Plaintiff could work and had the

10  ability to learn on the job.  He relied upon Dr. Schneider's opinion that Plaintiff was not a good

11  candidate for verbal instruction but could learn from reading and doing, or best through direct

12  experience and on-the-job training. (A.R. 24.)  Also, the ALJ addressed Dr. Ferber's opinion of

13  December 2000 concerning Plaintiff's GAF score of 50. The ALJ noted the inconsistency of this

14  score when compared to Dr. Ferber's exam of Plaintiff that found his mental status to be

15  unremarkable along with the subsequent improvement of Plaintiff's symptoms. (A.R. 23.)

16         In summary, the Court rejects Plaintiff's contentions that the ALJ failed to state legally

17  sufficient reasons for his evaluation of the treating doctor's opinions. It is established that an ALJ

18  need not expressly discuss every item of evidence in order to show that it was considered.  Rather,

19  the ALJ must discuss evidence that is significant or probative and must explain why it was

20  rejected. Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011-12 (9th Cir. 2003). Here, the ALJ

21  evaluated the pertinent opinions and stated legally sufficient reasons for his weighing of the

22  opinions and for his rejection of significant, probative evidence. See, Vincent v. Heckler, 739 F.2d

23  1393, 1394-95 (9th Cir. 1984).

24         VI.    Failure to Develop the Record

25         The duty to develop the record arises where the record before the ALJ is ambiguous or

26  inadequate to allow for proper evaluation of the evidence. 20 C.F.R. §§ 404.1512(e) and

27  416.912(e); Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001).

28

1    Here, the ALJ had multiple opinions from both treating and non-treating sources, and the

2    ALJ did not find that the record was inadequate.  Rather, the ALJ implicitly concluded that the

3    record was adequate so to permit him to make all necessary findings. The ALJ properly rejected

4    Dr. Bryan's opinion because of the absence of supporting findings. See, 20 C.F.R. § 416.927(d)(2)

5    (stating that a treating source's opinion will be given controlling weight when it is well-supported

6    by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

7    the other substantial evidence in the case record).

8        VII.    Hypothetical Question to the Expert

9        The vocational expert (VE) testified that one who could lift twenty pounds occasionally

10   and ten pounds frequently; sit, stand, or walk six out of eight hours; and perform only simple,

11   routine, repetitive work could not perform Plaintiff's past relevant work as a truck or van driver,

12   but he could perform laundry work. (DOT 302.685-010) The VE reported that there were 56,000

13   such positions in California and nine to ten times that amount nationally.  The VE opined also that

14   such a person could perform work as a cashier (DOT 211.462-010) and that there were 113,000

15   such jobs in California. (A.R. 428-31.) The VE testified that if one could not complete a full

16   eight-hour day or forty-hour week, or if one could not work without missing four or more days of

17   work per month, then there would not be jobs available. (A.R. 431.) Further, one who needed to

18   lie down for an hour and one-half during the workday would not be able to work. (A.R. 432.)

19   Plaintiff challenges the ALJ's conclusion at step five concerning the existence of jobs for

20   Plaintiff, arguing that it lacks the support of substantial evidence because the hypothetical

21   question propounded by the ALJ to the expert did not include all Plaintiff's limitations, such as an

22   inability to complete a full eight-hour day or forty-hour week or to work without missing four or

23   more days of work per month, and a need to lie down for an hour and one-half during the

24   workday.

25   The Commissioner may carry its burden of showing ability to do other work by eliciting

26   the testimony of a VE in response to a hypothetical that sets out all the limitations and restrictions

27   of the claimant that are supported by the record. Andrews v. Shalala, 53 F.3d 1035, 1044 (9th Cir.

28

35

1   1995). A hypothetical question posed to a VE must be based on medical assumptions supported

2   by substantial evidence that reflects all the claimant's limitations. Osenbrock v. Apfel, 240 F.3d

3   1157, 1164-65 (9th Cir. 2001) (citing Roberts v. Shalala, 66 F.3d at 184)). An ALJ may accept or

4   reject restrictions in a hypothetical question that are not supported by substantial evidence.

5   Osenbrock, 240 F.3d 1157, 1164-65. Reliance on a hypothetical that fails to include all accepted

6   limitations is insufficient to carry the agency's burden of proving ability to engage in alternative

7   work. Andrews v. Shalala, 53 F.3d 1035, 1044 (9th Cir. 1995). Although a hypothetical should

8   include subjective complaints, it need not include complaints which were rejected with a

9   statement of reasons supported in the record. Light v. Social Security Administration, 119 F.3d

10  789, 793 (9th Cir. 1997).

11       Here, as previously discussed at length, the ALJ stated legally sufficient reasons,

12  supported by substantial evidence, for declining to place weight on both Dr. O'Connor's opinion

13  that Plaintiff would miss four days or more of work per month due to fatigue and Dr. Bryan's

14  opinion concerning Plaintiff's need to lie down during the day. The ALJ also expressly rejected

15  Plaintiff's testimony that he had to lie down during the day and nap due to fatigue related to

16  hepatitis C, reasoning that it was contradicted by treatment records and Plaintiff's own report that

17  he did not have to lie down or nap. (A.R. 24.)[10]

18       Because the limitations in question were rejected by the ALJ with a statement of legally

19  sufficient reasons, the hypothetical to the VE was complete, and the VE's testimony constituted

20  substantial evidence supporting the ALJ's conclusion at step five.

21       VIII.   Recommendation

22       Pursuant to the foregoing analysis, it is concluded that Plaintiff's arguments should be

23  rejected. The ALJ's decision was reached by the use of correct legal standards and is supported by

24  substantial evidence in the record.

25       Accordingly, it IS RECOMMENDED that

26  _____

27       [10]Again, the Court notes that Plaintiff has not challenged the ALJ's findings concerning his subjective
    complaints or credibility.

28

1.     Plaintiff's social security complaint BE DENIED; and

2.     Judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Roy T. Larson, BE ENTERED.

This report and recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  __**February 8, 2010**__            _____**/s/ Jennifer L. Thurston**_____
_____                                    UNITED STATES MAGISTRATE JUDGE